ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

OCT 0 7 2013

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

UNITED STATES OF AMERICA,
and STATE OF GEORGIA ex rel.
LAURA DILDINE,

        Plaintiffs,

v.

AARTI D. PANDYA, M.D.,
a/k/a ARATI D. PANDYA, M.D.,
and AARTI D. PANDYA, M.D.
P.C.,

        Defendants.

**RWS**

Case No.:

**1: 13-CV-3336**

**Filed Under Seal Pursuant to
31 U.S.C. §3730(b)(2)**

## COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT,  31 U.S.C. § 3730(b)(2), and GEORGIA FALSE MEDICAID CLAIMS ACT Ga. Code Ann. §§ 49-4-168 et. seq.

On behalf of the United States of America and the state of Georgia, Plaintiff and Relator, Laura Dildine ("Ms. Dildine" or "Relator") files this qui tam Complaint against Defendants, Aarti D. Pandya M.D. a/k/a Arati D. Pandya, M.D. and Aarti D. Pandya M.D. PC, ("Dr. Pandya" or "Defendants") pursuant to the Federal False Claims Act, 31 U.S.C. § 3730(b)(2), and Georgia False Medicaid Claims Act Ga. Code Ann. §§ 49-4-168 et. seq., and alleges as follows:

## I.    INTRODUCTION

**Federal and State Law Claims.**

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America and the state of Georgia in connection with the systematic upcoding and overbilling for tests and procedures related to patients seeking eye care from Defendants.

2.      Defendant Aarti D. Pandya, M.D., through her medical practice Aarti D. Pandya, M.D. PC, turned a blind eye to legitimate billing and compliance with government regulations and chose instead to focus on designing and implementing a deceptive scheme to generate unjustified and costly medical procedures, overstate procedures provided, and bill for procedures which were never provided.

3.      Defendants have submitted false claims to the government for medical tests and procedures which they did not actually provide. Defendants also submitted false claims to the government for tests and procedures which were provided but they had reason to know were not medically necessary.

4.      These actions have led to fraudulent overbilling of the Medicare, Medicaid and Tricare programs as well as other private insurance and government programs and created an unnecessary financial burden on patients and the government.

5.     Despite their unethical and fraudulent conduct, Defendants have undertaken no action to notify the patients who were subjected to unnecessary medical tests and procedures, or who were never given or administered critical medical tests, examinations and procedures which were the subject of invoices and statements.     Instead of making the required refunds to the federal and state governments for these false claims, Defendants have concealed the overpayments that resulted from the scheme and enjoyed the benefits of their fraudulent conduct.

6.     Moreover, instead of making the necessary systemic changes to avoid such pervasive fraud in the future, Defendants have simply continued to bill Medicare, Medicaid and other government agencies for expensive, unnecessary and improper tests and procedures and have falsely certified the medical necessity and appropriateness of those claims.

7.     Defendants have also repeatedly falsely certified that that are in compliance with the regulatory conditions of participation in Medicare, Medicaid and other government programs, when they know they are not in compliance, thereby knowingly submitting additional false claims to Medicare, Medicaid and other government agencies.

8.     The Defendants failed to return to federal and state government's payments that they were not entitled to receive and that they knew they were not entitled to retain.

9.      On behalf of the United States and the state of Georgia, Relator seeks to recover these damages as well as civil penalties arising from the false claims that defendants submitted or caused to be submitted to the United States and Georgia, as well as money damages for the wrongful retention of overpayments and refunds that are due and payable to the United States.

## II.    PARTIES

### The Relator

10.      Under the Federal False Claims Act and Georgia Medicaid False Claims Act, a person with knowledge of false or fraudulent claims against the government (a "Relator") may bring an action on behalf of the government and himself.

11.      Relator herein, Laura Dildine, is a citizen and resident of Covington, Georgia. The Relator has been employed at Defendant's office from October 2012 to present and works Monday through Friday, 8:30 a.m. to 5:30 p.m. Ms. Dildine is an office manager whose daily functions include handling insurance and billing for the practice.

12.      Relator is an original source of information within the meaning of the False Claims Act, 31 U.S.C. §3730(e)(4)(B) and Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 et seq.

**The Defendants**

13.     The Defendants are Aarti D. Pandya, M.D. a/k/a Arati D. Pandya, M.D., in her individual capacity and Aarti D. Pandya M.D., PC (hereinafter "Defendants" or "Dr. Pandya").  Dr. Pandya's business address is 1309 Milstead Road Suite E Conyers, Georgia 30012.  Dr. Pandya is a Board Certified Ophthalmologist who maintains a Georgia Medical license number 47501.    Dr. Pandya graduated from the University of North Carolina at Chapel Hill School of Medicine in 1995.

**III.    JURISDICTION AND VENUE**

14.     Jurisdiction is proper in this Court because Relator seeks relief on behalf of the United States of America for multiple violations of 31 U.S.C. §3729.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. §1367(a).

16.     Relator has made voluntary disclosures to the government prior to the filing of this lawsuit as required by 31 U.S.C. §3730(b)(2)

17.     This Court has personal jurisdiction over Defendants and venue is proper in the Northern District of Georgia pursuant to 31 U.S.C. §3732(a) because Defendants transact business in the Northern District of Georgia, and because the

acts alleged herein to be in violation of 31 U.S.C. §3729 occurred in Conyers,

Georgia, which is in the Northern District of Georgia.

## IV.   THE NATURE OF THE CASE

18.     In mid-December 2012, while Relator was training for the billing

position she currently holds, she began to suspect that the Defendants were

committing fraud. Relator had been training with Linda Bartley when she realized

that Defendants were billing for procedures that were not being performed. When

Ms. Bartley left Defendants' employment in January 2013, Relator took over Ms.

Bartley's position.

19.     During the next several months Relator discovered additional

fraudulent activity that was being committed by Defendants. Relator determined

that Defendants were committing fraud in the following ways:

> a)   Billing patients for extended visual field examinations when Dr.
>      Pandya was only performing a limited examination and in many
>      cases, an incomplete visual field examination.
>
> b)   Billing Medicare patients for visual field examinations without
>      actually conducting the procedure.
>
> c)   Billing patients for office visits during the 90 day global period
>      following surgery. These surgical follow up visits are included
>      in the global period and are included in the original charges to
>      the patient. Dr. Pandya would assign false diagnoses and bill
>      Medicare, Medicaid and Tricare for the services rendered which
>      should have otherwise already been covered.

d)   Upcoding the level of service of office visits provided to patients.

e)   Charging Medicare patients for a free surgery kit that was provided by an outside vendor as a complimentary gift. Dr. Pandya instructed her staff to use fictitious names in order to receive the surgery kits.

f)   Failing to provide Medicare patients with an Advanced Beneficiary Notice (ABN) form for any non-covered Medicare services. This form is required to show patients when services that are not covered will be billed to the beneficiary.

g)   Upcoding cataract surgery procedures compared to the level of service actually provided to the patients.

**Visual Field Examinations**

20.   Visual field examinations are conducted in order to diagnose inflammation or disorders of the eyelids, glaucoma, macular degeneration, optic nerve disorders, and retina or neurologic visual pathway disorders. Visual field examinations may also be done for patients having some new functional limitations due to visual field loss.

21.   The visual field test provides crucial information about the patient's disease status and progression. Most importantly this information measures the functional consequences of the disease such as how susceptible to falls, car accidents and hip fractures a patient may be as a result of visual field damage. The testing must be done carefully due to the consequential results of the testing.

22.    A visual field examination tests the total area in which the patient can see objects within the peripheral vision while focusing on a central point. This is done for one or both eyes and tests for blind spots or loss of peripheral vision.[1]

23.    Visual field testing can be billed using Current Procedure Terminology (CPT) codes[2] 92081, 92082 and 92083. The CPT code billed for a visual field examination will depend upon whether a limited screening or more comprehensive test is performed. The differences in the level of testing depend upon the equipment used and the amount of data captured from the visual field test. Generally speaking, the longer the test, the more data captured then the more CMS will pay for the test.

24.    The most basic visual field testing is billed under CPT code 92081. This is defined as a "visual field examination, unilateral or bilateral, with interpretation and report; limited examination (e.g., tangent screen, Autoplot, arc perimeter, or single stimulus level automated test, such as Octopus 3 or 7 equivalent)". The current allowable fee that is paid by Medicare is $35.05.[3]

25.    A more involved examination is billed under CPT code 92082. This is defined as a "visual field examination, unilateral or bilateral, with interpretation

---

[1] Peripheral vision is the farthest point on either side of the corner on the eye that a person can see movement.

[2] CPTs are a list of descriptive terms and identifying codes for reporting medical services and procedures.

[3] Medicare allowable fees are taken from the "Find-A-Code" medical coding software database. They represent Medicare's 2013 allowable fees. www.findacode.com. While portions of the alleged conduct occurred in prior years, all fees mentioned in this complaint are based on Medicare's 2013 allowable fees.

and report; intermediate examination (eg, at least 2 isopters on Goldmann perimeter, or semiquantitative, automated suprathreshold screening program, Humphrey suprathreshold automatic diagnostic test, Octopus program 33)". The current allowable fee that is paid by Medicare is $50.17.

26. The most complex examination of the visual field is billed under CPT code 92083. This is defined as a visual field examination, unilateral or bilateral, with interpretation and report; extended examination (eg, Goldmann visual fields with at least 3 isopters plotted and static determination within the central 30 degrees or quantitative, automated threshold perimetry, Octopus program G-1, 32 or 42, Humphrey visual field analyzer full threshold programs 30-2, 24-2, or 30/60-2). The current allowable fee that is paid by Medicare is $65.89.

27. The extended examination includes much more comprehensive quantitative automated visual field tests with multilevel threshold testing or manual tests with three isopters on Goldman visual field. The Octopus and the Humphrey-Zeiss field analyzer are popular automated devices that test stationary light source visual fields running a choice of programs by an onboard computer. They employ stationary pinpoint light sources or dots projected within a large, white bowl. The patient focuses on a central point and pushes a button when he/she sees the light or movement in different locations or at different intensities. The computer stores the data and generates a vision field report. The traditional Goldman perimeter is a

visual field test process that utilizes moving light sources. A trained technician moves the light source and monitors that the patient maintains central focus fixation throughout the test. A map of peripheral vision perception intensity within specified degrees is then produced. Interpretation and report is included within this CPT code. The extended test or threshold exam would be done if the patient were suspected of having a slow, progressive dimming of peripheral vision, like glaucoma.

28. As shown above, the amount of CMS reimbursement for visual field examinations ranges from $35.05 to $65.89. Defendants almost always utilized the CPT code that would result in Defendants getting the highest reimbursement rate from Medicare regardless of the type of visual field examination required or actually performed.

29. The Defendants revenue report of charges for the time period January 1, 2012 through August 31, 2013 provides a comprehensive break down of charges by CPT codes.

| CPT Code | Description | Quantity | Changes |
| --- | --- | --- | --- |
| 92081 | Tangent Visual Field | 8 | $520.00 |
| 92082 | Visual Fields Im | 6 | $690.00 |
| 92083 | | 2,446 | $342,209.37 |

30.    In early 2013, Relator became aware that the visual field test was not being properly performed by Defendants or in some cases, not performed at all, yet these tests were being billed to Medicare, Medicaid and Tricare.

31.    In order to bill at the highest level (CPT 92083), an extended visual field examination must be performed.  Properly performed, an extended visual field examination should easily take 20 minutes and could take as much as 45 minutes per eye.

32.    Dr. Pandya instructed her staff that the testing should only take three minutes per eye.  Specifically, Dr. Pandya informed technician Angie Glaspie that she was taking too long with the visual field testing and that she should only spend three minutes for each eye during visual field examinations.  As such, patients did not receive an extended visual field examination but an overwhelming majority were billed as such.

33.    The computer software which runs the testing contains a safeguard which causes the print-out of the results to be labeled 'incomplete' if the test is incomplete or interrupted.

34.    An example of a patient test that was interrupted can be seen on December 12, 2012, when patient 1 received a visual field examination.  The testing results indicate that the patient's right eye was tested for 2 minutes and 26 seconds and that the patient's left eye was tested for 3 minutes and 37 seconds.

The front page of the two page document states in the comments section, "Test Not Completed or Was Interrupted."

35.     In such cases, Dr. Pandya would tell her staff to bill the full amount even if the test was incomplete.

36.     As evidenced in the above chart, Dr. Pandya conducted nearly 2500 visual field examinations during a 20 month period with 2,446 (98%) of them being billed at the highest reimbursement rate established by Medicare.

37.     During March of 2013 Relator became aware that the visual field examination device stopped working, yet Defendants continued to submit bills to government sponsored insurance programs and private insurance providers for tests which required the device to be operational.

38.     Upon information and belief, the device was still broken as of the date of filing this complaint, yet Defendants continue to bill patients and their insurance as though they are receiving this test.

39.     The below list of names and dates of service represents 36 Medicare patients who were billed by Defendants, but did not receive the visual field examination:

| PATIENT ID | Date Of Service |
| --- | --- |
| Patient 2 | 07/16/2013 |
| Patient 3 | 07/23/2013 |
| Patient 4 | 07/23/2013 |
| Patient 5 | 07/23/2013 |

| Patient 6 | 07/17/2013 |
| Patient 7 | 07/172013 |
| Patient 8 | 07/22/2013 |
| Patient 9 | 07/22/2013 |
| Patient 10 | 07/24/2013 |
| Patient 11 | 07/24/2013 |
| Patient 12 | 07/24/2013 |
| Patient 13 | 07/24/2013 |
| Patient 14 | 07/24/2013 |
| Patient 15 | 07/16/2013 |
| Patient 16 | 07/16/2013 |
| Patient 17 | 07/16/2013 |
| Patient 18 | 08/06/2013 |
| Patient 19 | 08/06/2013 |
| Patient 20 | 08/06/2013 |
| Patient 21 | 08/06/2013 |
| Patient 22 | 08/07/2013 |
| Patient 23 | 08/07/2013 |
| Patient 24 | 08/07/2013 |
| Patient 25 | 08/07/2013 |
| Patient 26 | 08/07/2013 |
| Patient 27 | 08/05/2013 |
| Patient 28 | 08/07/2013 |
| Patient 29 | 08/07/2013 |
| Patient 30 | 08/28/2013 |
| Patient 31 | 08/28/2013 |
| Patient 32 | 07/03/2013 |
| Patient 33 | 08/05/2013 |
| Patient 34 | 08/05/2013 |
| Patient 35 | 08/05/2013 |
| Patient 36 | 08/05/2013 |
| Patient 37 | 08/05/2013 |

40.     A review of patient's records, examination notes, billing information and in-office procedures checklist for patients 3, 10, 11, 19, 30 and 31 demonstrates how Dr. Pandya would document the fact that a visual field examination was not performed but was billed to Medicare.

41.     The cover page for each of the patient records is identified as an "In-Office Procedures" list.  The cover page for patient 9 is below:

| Patient Name: ███████████ | | Account #: 206A | |
|---|---|---|---|
| IN OFFICE PROCEDURES | | | |
| PROCEDURE | DATE | INITIALS | |
| OCT FM | 11-28-12 | AG | |
| OCT FM | 6.19.13 | AG | |
| Fundus /*VF: | 7.24.13 | AG | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

42.     All six patient records listed above have similar markings, wherein the asterisk (*) next to the "VF" indicates that the test was billed but not performed. Dr. Pandya told her staff that she would conduct the test on the patient's next visit presumably when the machine is repaired.

**OFFICE VISIT CHARGES DURING GLOBAL PERIOD**

43.    The global period is defined as a period of time immediately prior to or after a surgical procedure in which all routine follow-up care is included in the original charge amount.

44.    The cataract global surgery fee includes various components of the surgical service as well as related preoperative and postoperative evaluation and management (E&M) services provided during a 92-day period known as the global surgery period.

45.    The 92-day period includes the day before the surgery, the day of the surgery, and the 90 days immediately following the day of surgery. Since the global surgery fee includes payment for related E&M services, Medicare carriers should not separately reimburse physicians for these services.[4]   However, Dr. Pandya would routinely bring patients back after cataract and Lasik[5] surgery during the "global period" in order to charge for office visits.

46.    Specifically, in order to get around the global period restrictions, Dr. Pandya used false ICD-9 or diagnosis codes that would appear unrelated to the

---

[4] Department of Health and Human Services/Office of Inspector General; Report # A-05-06-0040; Review of Cataract and Global Surgeries and Related Evaluation and Management Services; 05 March 2007. https://oig.hhs.gov/oas/reports/region5/50600040.pdf
[5] Lasik surgery is not covered by Medicare and Medicaid and as such, there is no loss to the government. Patients with private health insurance plans would be impacted by this activity.

surgical diagnoses, such as "floaters" (ICD-9 379.24) or "aphakia" (ICD-9 379.31) and attach billing modifier 24 to the surgical CPT code.[6]

47.     Dr. Pandya performed between 40 to 50 cataract surgeries per month. This amounts to the Defendant charging as many as 120 office visits inappropriately within the 3 month global period.

48.     Dr. Pandya would use CPT codes 99213-24, 99214-24 and 99215-24. The modifier code (24) is defined as "unrelated evaluation and management service by the same physician or other qualified health care professional during a postoperative period."  During the time period 1/1/12 through 8/31/13, Defendants billed using modifier 24 for the following CPT codes:

| CPT Code | Number of Patients |
|----------|-------------------|
| 99213-24 | 217 |
| 99214-24 | 546 |
| 99215-24 | 5 |

49.     A review of the revenue report charges for Defendants during the time period 1/1/12 through 8/31/13 reveals that by using modifier 24, Defendants were able to bill patients, Medicare, Medicaid, Tricare and private insurance companies an additional $110,175.

## BILLING PRACTICES

[6] CPT Modifier "24"- unrelated evaluation and management services by same physician during postoperative period billed with CPT modifier "24" and accompanied by documentation that supports that the service is not related to the postoperative care of the procedure.

50.     Dr. Pandya instructed her staff to upcode patient billings and in some instances, to add procedures that did not occur in order for Defendants to bill Medicare.   Dr. Pandya regularly complained to Relator about the billing on procedures that Dr. Pandya performed and on the reimbursements provided by Medicare and Medicaid.

51.     Dr. Pandya instructed Relator to not bill out for procedures until Dr. Pandya was able to review all of the possible codes and how much they each paid. Dr. Pandya would review the potential codes and reimbursement rates for various procedures and then decide which one she wanted submitted. In essence, the primary factor which determined the code to be billed was the highest reimbursement amount and not the actual services provided.

52.     A pterygium is a growth of tissue on the cornea of the eye which may cause irritation, redness, swelling and itching of the eye.   In advanced cases, pterygium can interfere with vision.   The allowable Medicare fee for CPT code 65420 (excision or transposition of pterygium; without graft), is $505.37.  This is considered a simple excision.  The more extensive excision involves a graft and is represented by CPT code 65426 (excision or transposition of pterygium; with graft) and the allowable Medicare fee is $680.15.

53.     As an example of Defendants' fraudulent billing practices, consider Medicare patient 38.  Patient 38 was to have a pterygium removed by Dr. Pandya.

After the procedure, as she had been instructed, Relator provided Dr. Pandya with the list of possible codes and reimbursement rates.  Dr. Pandya instructed Relator to add that she had also performed a graft procedure.[7]  However the hand written patient notes did not indicate that a graft was necessary.  The patient billing statement reflects that Medicare was charged for the graft procedure although it was never performed.

54.    From July 24 through July 30, 2013, Dr. Pandya was out of the country and Dr. Margi Patel worked at Defendants' office to cover Dr. Pandya's appointments during her absence.   Dr. Patel saw approximately 150 patients during this time.  Dr. Patel identified the appropriate CPT code to be charged for services she rendered for patients and recorded them on the billing sheet used by Defendants' office.  However, these bills were not immediately submitted because Dr. Pandya insisted on reviewing them.  When Dr. Pandya returned from her trip, she reviewed the bills and on at least nine occasions, she struck through or altered the submissions of Dr. Patel.  Each of Dr. Pandya's edits reflected an upcoding for higher reimbursement even though those procedures or level of service were not provided by Dr. Patel.

55.    Defendants would charge for procedures that were not performed on all types of insurance, not just on Medicare and Medicaid.

[7] A graft is taken from under the eyelid of the patient and used to repair a defect.  In some instances, the graft membrane can be obtained from a tissue bank.

56.    Dr. Pandya instructed Relator to go back to rebill and seek reimbursement for additional procedures for the following ten patients (three of which are Medicare patients).    These patients were charged for procedures by Defendants that they did not receive:

- Patient 39 (Medicare)
- Patient 40 (Medicare)
- Patient 41 (Medicare)
- Patient 42
- Patient 43
- Patient 44
- Patient 45
- Patient 46
- Patient 47
- Patient 48
- Patient 49

57.    Patient 50 came into the office to have a pterygium removed from his eye. Dr. Pandya did not remove the pterygium but billed patient's insurance as though she had. A short time later, the patient came back into the office and told Dr. Pandya, now that she had billed his insurance and got paid for it; Dr. Pandya needed to remove it. Dr. Pandya did remove the growth after the patient demanded it. This is but one example that typified the way Dr. Pandya played fast and loose with her office billing. Had patient 49 not come back to demand the procedure, Dr. Pandya would never have followed up to provide the services she already billed.

## OFFICE VISIT UPCODING

58.     Defendants would regularly upcode office visits to overstate the level of service provided.

59.     During examinations, a technician would accompany Dr. Pandya into the room and record what occurred during the visit with the patient. These are commonly referred to as SOAP notes.[8] SOAP notes must correspond to the level of care provided in the office visit and include the key components described in the CPT code description that corresponds to the level of service billed.

60.     CPT code 99213 is described as an office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: An expanded problem focused history; an expanded problem focused examination; Medical decision making of low complexity. Counseling and coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of low to moderate severity. Typically, 15 minutes are spent face-to-face with the patient and/or family. The Medicare allowable rate is $77.82.

61.     CPT code 99214 is described as an office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2

---

[8] SOAP is an acronym for subjective, objective, assessment, and plan and it is a method of documentation used by health care providers to write out notes in a patient's chart.

of these 3 key components: A detailed history; A detailed examination; Medical decision making of moderate complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Typically, 25 minutes are spent face-to-face with the patient and/or family. The Medicare allowable rate is $113.99.

62.     CPT code 99215 is described as an office or other outpatient visit for the evaluation and management of an established patient, which requires at least 2 of these 3 key components: A comprehensive history; A comprehensive examination; Medical decision making of high complexity. Counseling and/or coordination of care with other physicians, other qualified health care professionals, or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs. Usually, the presenting problem(s) are of moderate to high severity. Typically, 40 minutes are spent face-to-face with the patient and/or family. The Medicare allowable fee is $152.25.

63.     Dr. Pandya would normally spend between three to four minutes with a patient and bill for a level of service that typically takes 25 minutes. The below chart identifies the total number of office visits and the CPT code used for the time period 1/1/12 through 8/31/13:

| CPT Code | Description | Number of Patients |
|----------|-------------|--------------------|
| 99211 | (none) | 0 |
| 99212 | Estab. Pt. level 2 exp | 9 |
| 99213 | Estab. Pt. level 3 Det | 877 |
| 99214 | Expanded Office visit | 6,750 |
| 99215 | Expanded office visit | 709 |

64.     As seen above, Dr. Pandya billed for the highest two office visit codes in almost 90% of all patient visits.  The revenue report charges for the above time period allowed Defendants to bill patients, Medicare, Medicaid, Tricare and private insurance companies nearly $1.3 million.

**DEFENDANTS' KNOWLEDGE OF BILLING IRREGULARITIES**

65.     Dr. Pandya was, without question, aware of the irregularity of her billing practices.

66.     Dr. Pandya received numerous letters from private insurance companies and CMS questioning the high percentage of evaluation and management codes that Defendants were submitting.

67.     In a letter dated June 1, 2013 from Cigna insurance to Dr. Pandya, Cigna provided data collected from January 2012 through December 2012 on CPT codes being utilized by Dr. Pandya for Evaluation and Management (E&M).  The data concludes that "your E&M submissions patterns differed from your peer group by at least 0.5 standard deviations."

68.     Page two of the Cigna letter provides a chart titled Office/Outpatient Visit, Established Patient. For the E&M CPT code 99214, Dr. Pandya utilized this code 77% of the time versus her peers who used the code only 28% of the time.

69.     Dr. Pandya saw 6,750 patients who were billed out under CPT 99214. According to the American Medical Association's CPT 2013 Standard Edition, CPT code 99214 typically requires 25 minutes of face-to-face time with the patient or family.[9]   This means that Dr. Pandya spent 2,813 hours on detailed patient examinations.

70.     Dr. Pandya's work schedule was normally 8:45 AM to 5:00 PM during the week except for Thursdays when she was performing surgeries. In August 2013, Dr. Pandya started taking-off every other Friday. The total number of hours the office would have been available to see patients was 2,728 hours given Dr. Pandya's office schedule and accounting for the days she was in the operating room. The Defendants actually billed more hours seeing patients using CPT code 99214 than the actual time the office was open. This also does not include the remaining 1,595 billed office examinations in the same reporting period of which 709 patients of those (billed out under CPT 99215), would typically require 40 minutes of face-to-face time.

---

[9] It should be noted that a review of the patient's file prior to meeting the patient is considered to be part of the face-to-face time.

71. Dr. Pandya should have been utilizing CPT code 99212 which more accurately describes the level of service to the patient. Typically, this results in ten minutes of face-to-face time with the patient. The allowable fee for Medicare patients for CPT 99212 is $43.80. The allowable fee for Medicare patients for CPT 99214 is $107.04. Defendants' upcoding has caused Medicare to be billed an additional $63.24 for each patient.

## ADVANCED BENEFICIARY NOTICE

72. Defendants do not have Medicare patients sign the Advanced Beneficiary Notice[10] (ABN's) form prior to upgrading eye lens for cataract surgery. Although there is no financial loss to the government by not having the ABN signed, it is required by Medicare when services that are not covered are to be billed to the beneficiary. This notifies the beneficiary of their out-of-pocket expenses upfront. Patients were being charged for upgraded lenses without a signed ABN.

73. The Limbal Relaxing Incision (LRI) is used for managing astigmatism at the time of cataract surgery. Defendants would charge patients $695 or $895 for the LRI Mini mono. The Defendants would also charge between $1,355 and $1,695 for the Tecnis or ReStor lens. There is no Medicare reimbursement since

the upgraded lenses are not covered.  However, Defendants failed to obtain signed ABN forms from patients.

## SURGERY KITS – BAUSCH AND LOMB:

74.    Bausch and Lomb created a program where patients who are to have cataract surgery are given a free surgery kit that contains a surgical eye patch, tape and sunglasses.  In Dr. Pandya's thirst for money, she charged her patients for the surgery kits.

75.    The Bausch and Lomb program was set up so that the patients could register online.   The Defendants office was supposed to have the pamphlets explaining the free surgery kits available to the patients. The patient would then go online and use the unique identifier number that was included in the pamphlet to register.  The patient was to provide the name and address of the doctor and the date of their surgery.   Instead, Defendants' patients would never see the Bausch and Lomb pamphlets.  Dr. Pandya would tell her staff to fill in actual patient names or fictitious names on the pamphlet and go online and sign the patients up.  Dr. Pandya would then charge the patients $25 or more for the surgery kits which she acquired for free under fraudulent pretenses.

76.    In addition to the above allegations, Defendants engage in widespread fraudulent billing practices in order to maximize the profits from treating patients. These practices are rampant and deep rooted throughout the Defendants operations.

## UPCODING CATARACT SURGERY

77.   Dr. Pandya  upcoded services on patients who were having cataract surgery.   Dr. Pandya would frequently bill cataract surgery using the more complex procedure CPT code 66982 rather than the code for routine cataracts (CPT 66984).

78.   CPT code 66982 is described as Extracapsular cataract removal with insertion of intraocular lens prosthesis (1-stage procedure), manual or mechanical technique (eg, irrigation and aspiration or phacoemulsification), complex, requiring devices or techniques not generally used in routine cataract surgery (eg, iris expansion device, suture support for intraocular lens, or primary posterior capsulorrhexis).     The Medicare allowable fee for CPT 66982, complex extracapsular cataract removal, is $888.81 compared to routine cataract removal (CPT code 66984) $717.33.

79.   The code for complex cataract surgery is intended to differentiate the extraordinary work performed during the intraoperative or postoperative periods in a subset of cataract operations.  Complications during surgery, such as extended surgery time or unplanned procedures, do not necessarily qualify for the case to be coded as complex.     Medicare and CPT guidelines state that the use of instrumentation or techniques not typically used in a routine cataract procedure can be considered complex.

80.     Dr. Pandya claimed that patients who were on the prostate medication "Flomax" were more complicated. Although "Flomax" has been known to cause a condition that can make cataract surgery more difficult, it is a rare occurrence. There is about a 2% incidence that patients will develop Intraoperative Floppy Eye Syndrome when taking the drug Flomax.[11] Instead, Dr. Pandya's high rate of billing complicated cataract surgery occurred to offset the money lost on patients that did not upgrade to the more expensive intraocular lens.

81.     Medicare's Local Coverage Determination (LCD) L30159 states representatives of the American Academy of Ophthalmology, and the American Society of Cataract and Refractive Surgery estimate that 1% to 4% of cataract operations require the extraordinary work sufficient to meet the definition of complex cataract surgery.  However, Defendants' rate of complicated cataract surgery is 45% based on the revenue report of charges for the time period January 1, 2012 through August 31, 2013.

82.     The revenue report of charges for the time period January 1, 2012 through August 31, 2013 which provides a comprehensive break down of charges by CPT codes.

---

[11] U.S. National Library of Medicine National Institutes of Health; *Transactions of the Ophthalmological Society.* "Intraoperative Floppy Eye Syndrome: Pathophysiology, Prevention and Treatment" Allan J. Flach, M.D., PharmD; 2009 December; 107: 234-239. www.ncbi.nlm.mih.gov/pms/articles/PMC2814568/.

83. The CPT codes for complicated cataract removal 66982 for the above

time period are:

| CPT Code | Quantity | Charges |
|----------|----------|---------|
| 66982 | 43 | $129,000 |
| 66982-79 | 3 | $9,000 |
| 66982-LT | 19 | $57,000 |
| 66982-RT | 24 | $72,000 |

84. The CPT codes for routine cataract removal 66984 for the above time

period are:

| CPT Code | Quantity | Charges |
|----------|----------|---------|
| 66984 | 44 | $110,000 |
| 66984-50 | 2 | $5,000 |
| 66984-79 | 4 | $10,000 |
| 66984-LT | 38 | $95,0000 |
| 66984-RT | 23 | $57,500 |

85. The above revenue report charges show that the Defendants billed

Medicare, Medicaid, Tricare and private insurance companies nearly $267,000 for

complex cataract surgeries and $277,500 for routine cases.

## FINANCIAL IMPACT

86. Defendants billing of the Medicare and Medicaid programs has

increased dramatically during the past 4.5 years. The following is a breakdown of

the total billing for Medicare and Medicaid programs for the years 2009, 2010,

2011, 2012, and 2013 (through August 31, 2013):

| Year | Medicare Billing | Medicaid Billing |
|------|------------------|------------------|
| | | |

| 2009 | $652,976 | $35,865 |
|---|---|---|
| 2010 | $979,717 | $30,855 |
| 2011 | $1,765,391 | $36,555 |
| 2012 | $1,776,923 | $64,656 |
| 2013* | $971,693 | $51,882 |
| **Total** | **$6,146,700** | **$219,813** |

87.     Clearly, Defendants' actions have caused federally funded health care

programs to lose millions of taxpayer funds and their actions have deprived

patients the level of care that is expected (and required) in the United States.

## THE FALSE CLAIMS ACTS

88.     The Federal False Claims Act, as amended, provides in pertinent part

that:

> [A]ny person who (A) knowingly presents, or causes to be presented,
> a false or fraudulent claim for payment or approval; (B) knowingly
> makes, uses, or causes to be made or used, a false record or statement
> material to a false or fraudulent claim; ... or (G) knowingly makes,
> uses, or causes to be made or used, a false record or statement
> material to an obligation to pay or transmit money or property to the
> Government, or knowingly conceals or knowingly and improperly
> avoids or decreases an obligation to pay or transmit money or
> property to the Government, is liable to the United States
> Government for a civil penalty of not less than $5,500 and not more
> than $11,000, as adjusted by the Federal Civil Penalties Inflation
> Adjustment Act of 1990...plus 3 times the amount of damages which
> the Government sustains because of the act of that person. 31 U.S.C.
> § 3729(a)(1)

89.     The terms "knowing" and "knowingly" in the FCA provision above

"mean that a person, with respect to information (1) has actual knowledge of the

information; (2) acts in deliberate ignorance of the truth or falsity of the

information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

90.    The Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, et seq. is substantively similar to the federal False Claims Act, in that it imposes liability on any person who:

   *(1)    Knowingly presents or causes to presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval'*

   *(2)    Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;*

   *(3)    Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid: - O.C.G.A. §§ 49-4-168.1(a)(1)-(3)*

## CLAIMS PROCESSING PROCEDURES UNDER THE MEDICARE PROGRAM

91.    In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 et seq., known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426-1.

92.    Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an

agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

93. CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds. In Georgia, Cahaba Government Benefit Administrators serve as the fiscal intermediary.

94. There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them. 42 U.S.C. §§ 1395j-1395w-5. The allegations herein involve Part B for services billed by the Defendants to Medicare.

95. In order to get paid from Medicare, providers, like Defendant herein, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS

1500. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed.

96.    To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

> *I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.*

That certification is then followed by the following "Notice:"

> *Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.*

97.    At all times relevant to this complaint, Defendants were a Medicare Part B and Medicaid provider. Upon information and belief, Defendants submitted thousands of Medicare and Medicaid claims daily during Relator's employment.

## CONDITIONS OF PARTICIPATION AND CONDITIONS OF PAYMENT

98.    To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc.

The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

99.     One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information. 42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

100.    Various claims forms, including the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically "required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations. 42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406. Providers must also certify that the information submitted is correct and supported by documentation and treatment records. *Id. See also*, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

101.    The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

102.    As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports).    42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. See also 42 C.F.R. §§ 489.40, 489.31. In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony. Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments. 42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

103.    Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS.    42 U.S.C. § 1395u(l)(3).    In such cases, the overpayment is subject to recoupment.    42 U.S.C. § 1395gg.    CMS is entitled to collect interest on overpayments. 42 U.S.C. § 1395l(j).

**MEDICAID**

104.    Although false claims submitted to Medicare are the primary FCA violations at issue in this case, the fraudulent billing practices of Defendants impacted patients who were beneficiaries of one of three federally-funded health

care benefit programs – Medicare, Medicaid, or TRICARE/CHAMPUS. Accordingly, those other two programs are briefly discussed as well.

105.   The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals.  The Medicaid regulations can be found at 42 C.F.R. § 430, et seq. CMS administers Medicaid on the federal level while the Georgia Department of Community Health serves as the Georgia State administrator or counterpart.   Reimbursement of physician charges is governed by Part B of Medicare.

106.   As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

107.   Medicaid funding is shared among the federal government and participating states. The relative share of federal-state funding varies from state to state.   According to the most recently published Federal Medical Assistance Percentage, Georgia's current state percentage responsibility for Medicaid claims is 33.84%.[12]

---

[12] As published by the Secretary of HHS, Federal Register, Volume 75, Number 217

108.    At all times relevant to this complaint, Defendants were Medicare and Medicaid providers. Upon information and belief, Defendants submitted hundreds of Medicaid claims during Relator's employment.

**TRICARE, formerly known as CHAMPUS**

109.    TRICARE is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, et seq.).

110.    Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i). And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

111.   Upon information and belief, Defendants treated patients who were beneficiaries of Tricare.  The same type of billing practices referenced above occurred with regard to Tricare insured patients.

## IV.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Presentation of False Claims pursuant to 31 U.S.C. § 3729(a)(1)(A)

112.   Relator repeats and incorporates herein by reference the allegations contained in Paragraphs 1 through 111 of this Complaint as if fully set forth herein.

113.   As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendant have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A) that is, Defendants knowingly made or presented, or caused to be made or presented, to the United States, claims for payment for ophthalmology services for patients for medically unnecessary services, services that were not provided, services that were not provided as billed, or services which were otherwise inappropriate.

114.   The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, has paid and continues to pay the claims that would not be paid but for Defendants' false and fraudulent claims for reimbursement.

115.   By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 per false claim. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

## SECOND CAUSE OF ACTION
### Making or Using False Record or Statement to Cause Claim to be Paid
### Pursuant to 31 U.S.C. § 3729(a)(1)(B)

116.   Relator repeats and incorporates herein by reference the allegations contained in Paragraphs 1 through 111 of this Complaint as if fully set forth herein.

117.   As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendants – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

118.   By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial; and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not

more than $11,000 per false claim. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

### THIRD CAUSE OF ACTION
### Making or Using False Record Statement to Avoid an Obligation to Refund
### Pursuant to 31 U.S.C. § 3729(a)(1)(G)

119.    Relator repeats and incorporates herein by reference the allegations contained in Paragraphs 1 through 111 of this Complaint as if fully set forth herein.

120.    As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendants – material to an obligation to pay or transmit money to the government to knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money or property to the government.

121.    The government relied upon the false records or statements in remitting payments to Defendants and in not seeking reimbursement from Defendants.

## FOURTH CAUSE OF ACTION
### Presentation of False Claims
**Pursuant to Georgia False Medicaid Claims Act O.C.G.A. §49-4-168 et. seq.**

122.   Relator repeats and incorporates herein by reference the allegations contained in Paragraphs 1 through 111 of this Complaint as if fully set forth herein.

123.   As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the state of Georgia in violation of the Georgia False Medicaid Claims Act O.C.G.A §49-4-168 et. seq.

## FIFTH CAUSE OF ACTION
### Making or Using False Record Statement to Cause Claim to be Paid
**Pursuant to Georgia False Medicaid Claims Act O.C.G.A. §49-4-168 et. seq.**

124.   Relator repeats and incorporates herein by reference the allegations contained in Paragraphs 1 through 111 of this Complaint as if fully set forth herein.

125.   As particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by Defendants – material to false or fraudulent claims in violation of Georgia False Medicaid Claims Act.

## SIXTH CAUSE OF ACTION
### Making or Using False Record Statement to Avoid an Obligation to Refund
**Pursuant to Georgia False Medicaid Claims Act O.C.G.A. §49-4-168 et. seq.**

126.   Relator repeats and incorporates herein by reference the allegations

contained in Paragraphs 1 through 111 of this Complaint as if fully set forth herein.

127.   As particularly set forth in the foregoing paragraphs, by virtue of the

acts alleged herein, Defendants have knowingly made, used, or caused to be made

or used, false records or statements to conceal, avoid, or decrease an obligation to

pay to the state of Georgia.

## DEMAND FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States and the state of

Georgia, hereby demands judgment against Defendants that:

## As to the Federal Claims:

a. Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' conduct, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

b. Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d) of the False Claims Act and/or any other applicable provision of law;

c. Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and

d. Relator be awarded such other and further relief as the Court may deem to be just and proper.

## As to the State Claims:

a. Pursuant to the Georgia False Medicaid Claims Act, O.C.G.A. §49-4-168 et. seq., Defendants pay an amount equal to three times the amount of damages the state of Georgia has sustained because of Defendants' conduct, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of the Georgia False Medicaid Claims Act;

b. Relator be awarded the maximum amount allowed pursuant the Georgia False Medicaid Claims Act and/or any other applicable provision of law;

c. Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by the Georgia False Medicaid Claims Act and any other applicable provision of the law; and

d. Relator be awarded such other and further relief as the Court may deem to be just and proper.

## TRIAL BY JURY

Relator hereby demands a trial by jury as to all issues.

Dated this _____ day of October, 2013.

Respectfully submitted,

Robert A. DeMetz, Jr.
Georgia Bar No.: 215070
MORGAN & MORGAN, P.A.
P.O. Box 57007
Atlanta, Georgia 30343-1007
rdemetz@forthepeople.com
Telephone: (404)965-8811 x4034
Direct Dial: (404)965-8819
Direct Fax: (404)720-3841

John A. Yanchunis
Florida Bar No. 324681
jyanchunis@forthepeople.com
James D. Young
Florida Bar No. 567507
jyoung@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 One Tampa City Center, 7th Fl.
Tampa, Florida 33602
(813) 318-5169 (Telephone)
(813) 222-4793 (Facsimile)

## CERTIFICATE OF COMPLIANCE

This is to certify that the within and foregoing pleading has been prepared

using Times New Roman, 14 point, which is approved by the Court in L.R. 5.1B.

Dated 7th day of October, 2013.

Robert A. DeMetz, Jr.
Georgia Bar No.: 215070
MORGAN & MORGAN, P.A.
P.O. Box 57007
Atlanta, Georgia 30343-1007
rdemetz@forthepeople.com
Telephone: (404)965-8811 x4034
Direct Dial:  (404)965-8819
Direct Fax:  (404)720-3841